IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED TRANSPORTATION UNION and WILLIAM C. MILLER, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) No. 08 C 4001 ) |
| ILLINOIS CENTRAL RAILROAD CO., | ) ) |
| Respondent. | ) ) |

# MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Petitioners' motion for summary judgment and Respondent's motion for summary judgment. For the reasons stated below, we grant in part and deny in part the motions for summary judgment.

# BACKGROUND

Petitioner William C. Miller (Miller) was employed by Respondent Illinois Central Railroad Co. (ICR). On November 29, 2005, Miller pled guilty to embezzling funds from his former union. Miller contends that on that same day, at 7:50 p.m., he faxed a letter to his supervisor (Notification Letter) notifying his

1

supervisor of the conviction.  On December 8, 2005, ICR issued Miller a notice of investigation, claiming that Miller failed to notify ICR of his conviction within one day of receiving notice of the conviction as required by ICR rule H (Rule H).  On December 14, 2005, the investigation proceeded, and Miller produced the Notification Letter and a fax log showing that the Notification Letter had been received by his supervisor's fax machine.  Despite such evidence, Miller's supervisor denied that he ever received the Notification Letter.  On December 22, 2005, Miller was issued a notice of discipline by ICR, and his employment was terminated.

On February 23, 2006, Miller was sentenced to two years in prison.  While Miller was serving his sentence, Petitioner United Transportation Union (Union), Miller's union, brought a claim on behalf of Miller seeking reinstatement and back pay.  The claim progressed to arbitration before the Public Law Board (Board).  The Board was composed of one partisan member of the Union, Kim Thompson (Thompson), one partisan member of ICR, Roger MacDougall (MacDougall), and one neutral member, Lewis L. Ellsworth (Ellsworth).  Miller contends that the award of the Board could not become final until at least two members of the Board signed the award.  On July 27, 2007, Ellsworth signed a draft of Award No. 31 of the Public Law Board No. 6985 (Draft).  The contents of the Draft included language indicating that Miller did not violate Rule H and ordering that Miller be returned to service with

seniority rights unimpaired and that he receive back pay, if any, reduced by any outside earnings and unemployment compensation.

At this point, the Draft had only the signature of Board member Ellsworth and neither of the other two members of the Board had signed it. On August 3, 2007, Thompson allegedly did not agree with the Draft's deduction of outside earnings, and the parties sought an executive session to address the situation. On August 10, 2007, despite the fact that the Draft lacked the required signatures of two Board members, ICR construed it as a final award and sent a letter (August 2007 Letter) to Miller demanding that he return to work within 15 days. Miller was still in prison at that time and he claims he informed ICR that he could not return to work until November 7, 2007.

On October 11, 2007, Board member Ellsworth issued an interpretation (October Interpretation) indicating that outside earnings were properly deducted from the back pay award. According to Petitioners, as of October 12, 2007, Board member McDougall was still not willing to sign the Draft and instead desired another executive session to further clarify the Draft. On November 6, 2007, Miller was released from prison. Board member Thompson was allegedly frustrated by the unwillingness of MacDougall to agree with the Draft, and Board member Thompson decided to sign the Draft on November 30, 2007, in order to move things along.

3

Petitioners contend that the Draft became a final award (Award 31) at that juncture because it had the approval of two members of the Board, Ellsworth and Thompson, as required by statute. The executive session sought by Board member MacDougall was subsequently held on December 12, 2007, and on December 13, 2007, MacDougall also joined the other two members of the Board by signing Award 31, even though at that point Award 31 already was final as of November 30, 2007, having the required signatures of two Board members.

Miller contends that in a December 27, 2007, letter, ICR informed Miller that he was no longer employed by ICR since he failed to report to work within 15 days of August 10, 2007, as demanded by ICR in the August 2007 Letter. Miller also contends that ICR sent Miller a check for $9,449, contending that it was the amount owed for back pay. Petitioners contend that ICR has failed to honor Award 31 by failing to reinstate Miller and by failing to award Miller proper back pay from the date of his improper dismissal on December 22, 2005. Petitioners, Miller and the Union, brought the instant action pursuant to 45 U.S.C. § 153 of the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, to enforce Award 31. Petitioners and ICR have each filed motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The

court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). When there are cross-motions for summary judgment the court must draw inferences "in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 500 (7th Cir. 2008).

## DISCUSSION

Petitioners contend that ICR failed to comply with Award 31 by failing to reinstate Miller's employment and by failing to properly compensate Miller for his back pay. The RLA provides for arbitration "of minor disputes." *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region*, 130 S.Ct. 584, 591-2 (2009). Pursuant to 45 U.S.C. § 153 First (p) of the RLA, if a carrier does not comply with the award of a public law board (PLB), the aggrieved employee can file a petition to enforce the award in federal district court. *Id.* In any review in federal court of a PLB award, "the findings and order of the [PLB] shall be conclusive on the parties, except that the order of the [PLB] may be set aside, in whole or in part, or remanded to the division,

for failure of the division to comply with the requirements of [45 U.S.C. § 153 of the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order." 45 U.S.C. § 153 First (q); *see also Kulavic v. Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507, 513 (7th Cir. 1993)(stating that "[a] PLB award may be appealed in federal court, but the scope of judicial review is 'among the narrowest known to the law'")(quoting in part *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 94 (1978)).

I.  Reinstatement

Petitioners contend that under the express relief granted in Award 31, ICR is obligated to reinstate Miller's employment. ICR argues that in the August 2007 Letter, it gave Miller an opportunity to be reinstated if he returned to work within 15 days, and Miller failed to do so.

A.  Effect of Board Member Signatures

ICR contends that the Draft was final in terms of the obligations it imposed on the parties when it was signed by one member of the Board, Ellsworth, in July 2007 and that when the second member of the Board signed the Draft, it was only a

"ministerial signing." (Ans. P SJ 4); (D SJ 4, 6). ICR contends that the two-signature requirement for Award 31 relates to a separate issue of whether the award is final for purposes of judicial review or judicial enforcement, but that the award was final in terms of the parties' ability to satisfy the undisputed obligations when the award was issued as a draft. (ICR Reply 3). ICR admits, pursuant to Local Rule 56.1, that it instructed Miller to return to work pursuant to the Draft in August 2007, and that there was no second signature by a Board member on the Draft, until November 30, 2007. (R PSF Par. 25, 40); (RSF Par. 19-20).

ICR fails to point to any precedent that makes the award finality distinction between the parties' obligations and judicial enforcement and review that ICR now proposes. The Draft was nothing more than a proposed draft and had no legal significance until signed by at least two Board members. 45 U.S.C. § 153 Second; *United Transp. Union v. CSX Transp. Inc.*, 2006 WL 3198811, at *3 (S.D. Ind. 2006)(stating when addressing a PLA award, that "[t]he RLA provides quite clearly that any two panel members who are in agreement are competent to make an award"); *Fox v. Northwest Airlines, Inc.*, 2003 WL 22272125, at *2 (D. Minn. 2003)(stating that "unless stipulated otherwise, a binding arbitration board award 'must be signed by at least a majority' of board members")(quoting in part *Air Line Pilots Ass'n v. Northwest Airlines, Inc.*, 498 F.Supp. 613, 619 (D. Minn. 1980)).

ICR's contention that the second Board member signature was merely a ministerial task is belied by the law that states that there is no legally recognizable award until an award contains two signatures. ICR also makes reference to other draft PLB awards requiring reinstatement of employees and contends that the Union did not object to immediate reinstatement of those employees. However, the other awards are not before this court, and such facts do not alter the legal authority that provides that there is no final award until the award is signed by two Board members.

ICR's argument is also inconsistent with the undisputed facts in this case indicating that both of the partisan members of the Board, Thompson and MacDougall, initially refused to sign the Draft, and that both sought executive sessions for interpretations or clarifications before finally agreeing with the proposed Draft and signing the Draft many months later. (R PSF Par. 22, 32, 40, 43 ). The undisputed facts thus illustrate that there was more to obtaining the second signature for the Draft than the logistics in getting the necessary documents to the partisan Board members for signatures. Two Board members, Thompson and MacDougall disagreed with portions of the contents of the Draft and they were not obligated under the law to sign the Draft that was proposed by one of the other Board members, Ellsworth. Thus, obtaining a second signature for the Draft was not a ministerial task.

ICR's argument that the Draft was final in terms of the obligations it imposed on the parties, and that the parties could thus act on the Draft is without merit. As explained above, the Draft was nothing more than the proposal of one member of the Board. The partisan members could have refused to sign it, and it could have been entirely altered before it became a final award. *See, e.g., Fox*, 2003 WL 22272125, at *2 (referring to "common arbitral practices . . . that arbitrators often circulate draft awards amongst board members for review before reaching a final decision"). ICR fails to explain how the scenario would have played out if Miller returned to work in August 2007, based on the Draft, and the final award later issued ruled in favor of ICR and did not order reinstatement. It would have made little sense for ICR to have reinstated Miller only to learn that it was never required to do so.

ICR contends that it could take the initiative and seek to satisfy its obligations based on the Draft in August 2007, and ICR did not need to wait until there was a second Board member signature. However, as explained above, there was no "award" in existence in August 2007, and thus at that time ICR could not have been acting pursuant to an award. ICR contends that in July 2007, after it received the Draft, ICR "knew that [Miller's] discharge would be overturned," (Ans. P SJ 4), but there is no evidence in the record to show that ICR should reasonably have had any such certainty upon receiving the Draft. ICR also points to language in the Draft that

indicated ICR would need to comply with the award within 30 days. However, again there was no "award" until November 2007, and the compliance deadline would have run from that point.

Also, although ICR contends that it could and should have immediately acted on the Draft in August 2007, there is no commitment by ICR, on the other hand, that it has and will allow employees to demand immediate reinstatement based on such drafts. The requirement for two signatures of Board members was more than procedural, it was a substantive requirement and had legal significance. Based on the undisputed facts in this case, we conclude that there was no "award" until November 30, 2007.

### B. Independent Decision

ICR also argues that Petitioners have failed to cite any authority that precluded ICR "from instructing [Miller] to return to service at any time after his December 22, 2005, dismissal. . . ." (Ans. PSJ 4). ICR thus contends that it could have independently acted to reinstate Miller, and it had a right to recall Miller to work at any time. However, ICR's argument is flawed at the outset because the August 2007 Letter specifically stated that "[t]hrough an arbitration award [Miller had] been reinstated back to service with" ICR. (Miller dep. Ex. 5). Thus, the August 2007

11

Letter itself recognizes that ICR's decision to reinstate Miller was connected to the proceedings before the PLB and not an independent, unrelated decision by ICR. Also, to the extent that ICR argues that it could have independently acted to address Miller's continued employment, ICR had notice of the proceedings before the PLB and had notice that Miller's reinstatement and back pay were at issue in those proceedings. ICR was not free to independently alter its employment relationship with Miller in order to circumvent the effects of the pending PLB decision before a decision was issued. This is especially true where ICR's actions are prejudicial to Miller.

### C. Lack of Jurisdiction

ICR also contends that this court lacks jurisdiction to address what ICR refers to as Miller's "second termination" in August 2007. ICR contends that the issues surrounding the August 2007 Letter and Miller's failure to return to work within 15 days are a separate employment dispute that is not covered by the PLB decision and cannot be reviewed by this court. ICR contends that the separate and independent dispute concerning Miller's August 2007 termination must first be addressed in arbitration. However, as explained above, the August 2007 letter itself acknowledged that ICR's actions were intended to be taken pursuant to what ICR

expected would be Award 31.  The assessment of the propriety of the supposed second termination by ICR in August 2007, involves an assessment of the very same facts relating to the Draft and eventually the legally binding Award 31 that are at issue in Petitioners' petition to enforce Award 31.  Also, although ICR purportedly tried to reinstate Miller in August 2007 pursuant to a draft by one member of the Board, there was no award in existence.  Miller's employment was already terminated in December 2005, and thus ICR's purported firing of an individual that had already been fired was without effect and did not create a new independent dispute.  Award 31, which is the subject of the instant petition, orders that ICR allow Miller to return to work.  To date, Miller has not been allowed to return to work.  ICR cannot avoid enforcement of Award 31 merely by purportedly dismissing Miller anew.  Thus, this court is not without jurisdiction to enforce Award 31 and order the reinstatement of Miller.  Based on the undisputed evidence, no reasonable trier of fact could conclude other than that Miller is entitled to reinstatement pursuant to Award 31.  Therefore, we grant Petitioners' motion for summary judgment on the issue of reinstatement and deny ICR's motion for summary judgment on the issue of reinstatement.

II.  Back Pay

Petitioners contend that ICR has failed to properly compensate Miller for back pay in accordance with Award 31. Petitioners contend that ICR improperly excluded from the back pay calculation the time that Miller was incarcerated. Petitioners also contend that ICR improperly excluded from the back pay calculation the time after ICR purported to terminate Miller's employment for a second time for failing to comply with the August 2007 Letter. ICR argues that it properly calculated back pay considering the period between Miller's termination in December 2005, and July 18, 2006, when Miller began serving his prison sentence.

A. Period of Miller's Incarceration

Petitioners contend that the ICR's calculation of back pay improperly excluded the time during which Miller was incarcerated. Petitioners correctly point out that Award 31 contained two specific reductions of the back pay award. Award 31 provided that "back pay, if any, shall be reduced by any outside earnings and employment compensation received." (Award 2). Petitioners are correct that the fact that Award 31 specifies the two reductions is an indication that the back pay could only be subject to those reductions. However, Petitioners overlook the fact that inherent in the award of back pay is the consideration of the employee's availability for work. Back pay is a remedy available to make a party whole, not to provide a

14

windfall to a party. *See, e.g., Skeets v. Johnson*, 805 F.2d 767, 784 (8th Cir. 1986)(stating that "[b]ackpay, by definition, represents an amount due an individual from his employer for the salary he should have received but did not because of an unlawful discharge"); *Estate of Braude v. United* States, 38 Fed.Cl. 476, 486 (Fed. Cl. 1997)(stating that "[b]ack pay is generally defined as the difference between what the plaintiff *could have earned* had he not been wrongfully terminated and the amount he actually earned from the date of his termination until the date of the judgment")(emphasis added)(internal quotations omitted)(quoting *Barry v. Posi-Seal Int'l, Inc.*, 36 Conn.App. 1, 647 (Conn. App. Ct. 1994)); *Fedio v. Circuit City*, 1998 WL 966000, at *4 (E.D. Pa. 1998)("[b]ack pay is defined as the amount of earnings a plaintiff *is entitled to* from the date of the unlawful retaliation until the date of judgment")(emphasis added); *Black's law Dictionary* 133 (7th ed. 1999)(defining backpay award as a "judicial or quasi-judicial body' decision that an employee or ex-employee is *entitled to* accrued but uncollected wages or benefits")(emphasis added). Thus, it should have been readily apparent to Petitioners and ICR that any calculation of an award of back pay would have included a consideration of the time that Miller was available to work. It is undisputed that Miller was incarcerated from July 18, 2006, until November 6, 2007, and thus was not available to work during that time period. (PSF Par. 11, 33). Nothing in Award 31 indicated that the back pay award

was intended to provide Miller with some sort of windfall that he would not have had if he had continued his employment at ICR. This conclusion is also consistent with the October Interpretation provided by the neutral Board member, in which the member compared the back pay award to damages for a breach of contract, which are intended to make a party whole. (Interp. 2). Thus, the back pay award calculation should not include a consideration of the time period while Miller was incarcerated. Therefore, we deny Petitioners' motion for summary judgment on the issue of back pay in regard to the period of Miller's incarceration, and we grant ICR's motion for summary judgment on the issue of back pay in regard to that time period.

### B. Period After August 2007 Firing

ICR, in calculating back pay, also declined to consider the time after ICR purportedly fired Miller a second time in August 2007 for allegedly failing to comply with the August 2007 Letter. ICR contends that it terminated Miller's employment after Miller failed to comply with the August 2007 Letter by not returning to work within 15 days. ICR contends that Miller is thus not entitled to any compensation for the period after August 2007, and that he should therefore not receive back pay for that period. However, as explained above, ICR's purported termination was directly connected to Award 31. ICR's actions in August 2007 were not initiated on the basis

of a legally binding document because there was no award until November 2007. Under the RLA, ICR is bound by Award 31, and ICR cannot limit the back pay amount owed under the award merely by claiming that it terminated Miller's employment in August 2007, especially when the Board was still considering the issue of an award. As we stated earlier, Miller is not entitled to back pay during the period of his incarceration, but once Miller was able to return to work after his incarceration ended, he was available for work, and ICR's purported termination in August 2007 does not alter that fact. Therefore, the time period starting when Miller had completed his incarceration and was able to return to work should be included in any back pay award. Therefore, we grant Petitioners' motion for summary judgment on the issue of back pay in regard to the period after Miller's incarceration, and we deny ICR's motion for summary judgment on the issue of back pay in regard to that time period.

## CONCLUSION

Based on the foregoing analysis, we grant Petitioners' motion for summary judgment on the issue of reinstatement and deny ICR's motion for summary judgment on the issue of reinstatement. We also deny Petitioners' motion for summary judgment on the issue of back pay in regard to the period of Miller's

17

incarceration, and we grant ICR's motion for summary judgment on the issue of back pay in regard to that time period. Finally, we grant Petitioners' motion for summary judgment on the issue of back pay in regard to the period after Miller's incarceration, and we deny ICR's motion for summary judgment on the issue of back pay in regard to that time period.

                                                  _____
                                                  Samuel Der-Yeghiayan
                                                  United States District Court Judge

Dated: March 16, 2010